UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Andrew Halloran,                                     File No. 24-cv-199 (ECT/ECW)

        Plaintiff,

v.                                                              **OPINION AND ORDER**

Unum Life Insurance Company of America,

        Defendant.

---

Denise Yegge Tataryn, Nolan Thompson Leighton & Tataryn PLC, Hopkins, MN, for Plaintiff Andrew Halloran.

Jacqueline J. Herring, Hinshaw & Culbertson LLP, Chicago, IL, and Margaret Ann Santos, Hinshaw & Culbertson LLP, Minneapolis, MN, for Defendant Unum Life Insurance Company of America.

---

In this ERISA lawsuit, Plaintiff Andrew Halloran seeks to recover long-term disability benefits under an employee welfare benefit plan (the "Plan") sponsored by his former employer, Tennant Company, and insured and administered by Defendant Unum Life Insurance Company of America. Halloran applied for benefits, and Unum approved his claim and began paying benefits in 2020. In 2022, after paying benefits for two years, Unum determined that Halloran was no longer disabled and terminated his benefits. In line with the Plan's administrative procedures, Halloran appealed the decision to terminate his benefits. Unum affirmed the initial termination decision, prompting this lawsuit.

Halloran and Unum have filed competing motions seeking judgment on the administrative record pursuant to Federal Rules of Civil Procedure 39(b) and 52(a)(1). In

doing so, the parties have made clear that they wish the Court to exercise its factfinding function and enter judgment based on the administrative record and briefs filed in connection with the motions. Judgment will be entered for Unum because Halloran has not established by a preponderance of the evidence that he was disabled under the "any gainful occupation" standard in April 2022, and therefore Unum properly terminated his benefits.

I[1]

A

*The Plan provides benefits to covered Tennant employees who become disabled, and for the first twenty-four months after an eligibility period is exhausted, the Plan defines disability based on a "regular occupation" definition.* The provision reads:

> You are disabled when Unum determines that:
>
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
>
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

AR at 223. The Plan defines each bolded term. "You" refers to the participant. AR at 244. "Regular occupation" means "the occupation you are routinely performing when your

---

[1]    This opinion describes the factual findings and legal conclusions required by Federal Rule of Civil Procedure 52(a)(1). The administrative record runs 2,299 pages in length. It was filed in Bates-numbered order at ECF Nos. 30-1 through 30-9. Citations in this opinion will refer to the administrative record by the short form "AR" and to specific pages by their assigned Bates numbers, located in the bottom-right corner of each page.

disability begins," considering "your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." AR at 243. The Plan defines "[l]imited" as "what you cannot or are unable to do." AR at 241. "Material and substantial duties" are those that "are normally required for the performance of your regular occupation" and "cannot be reasonably omitted or modified." *Id*. "Injury" is defined as "a bodily injury that is the direct result of an accident and not related to any other cause." *Id*.

*After the first 24 months of payments, the Plan defines "disabled" by reference to an "any gainful occupation" standard.* This provision reads:

> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

AR at 223. "Gainful occupation" means "an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds . . . 80% of your indexed monthly earnings, if you are working" or "60% of your indexed monthly earnings, if you are not working." AR at 240. The Plan also provides that after 24 months of payments, payments will stop "when you are able to work in any gainful occupation on a part-time basis but you do not," or "the date you fail to submit proof of continuing disability." AR at 231. "Part-time basis means the ability to work and earn between 20% and 80% of your indexed monthly earnings." AR at 242.

B

*Halloran worked for Tennant as a sheet metal fabricator.*  In this position, Halloran operated machinery to cut or shape metal from raw form into usable parts for assembly or aftermarket needs.  AR at 76.  The position required standing for 90% of a shift, frequently bending, twisting, squatting, and lifting with arms extended, lifting objects weighing up to 45 pounds, and good manual dexterity.  AR at 77.  Unum later categorized the position as that of "Metal Fabricator" or "Sheet Metal Production Worker" in the national economy, involving "medium work" that required "exerting up to 50 [pounds] occasionally," with "frequent reaching[] and handling" and "occasional walking, standing, [and] reaching upward."  AR at 316, 660–61.

*Halloran had a history of orthopedic problems in his right shoulder, clavicle, and scapula that did not cause him to be disabled.*  In 2006, when he was 18, Halloran was involved in a serious motor vehicle accident, after which he was airlifted and treated with an open reduction internal fixation of the right clavicle.[2]  AR at 1378.  In addition, "[t]here

---

[2]    "Open reduction and internal fixation . . . is a type of surgery used to stabilize and heal a broken bone."  *Clavicle Fracture Open Reduction and Internal Fixation*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/clavicle-fracture-open-reduction-and-internal-fixation (last visited July 2, 2025).  The procedure may be used to treat a broken clavicle.  *See id.* "During an open reduction**,** orthopedic surgeons reposition [the] bone pieces surgically back into their proper alignment."  *Id.*  "Internal fixation refers to the method of physically reconnecting the bones.  This method uses special screws, plates, wires, or nails to position the bones correctly.  This prevents the bones from healing abnormally."  *Id.*

4

was a laceration which [sic] proximal[3] right biceps injury" resulting in a "residual small defect." *Id*. After the accident, Halloran had "winging of the right scapula"[4] and "a long thoracic nerve injury" in his right shoulder. *See id*.

*Halloran injured his left shoulder in October 2019.* Halloran's left-shoulder injury occurred when he was at home, serving as the primary caregiver for his wheelchair-bound wife. AR at 153, 447. As Halloran was helping his wife transfer from her wheelchair to the bathroom, she slipped, and he caught her with his arms. AR at 151. He "felt a pop" in his left arm and a pulling sensation, and described cramping, bruising, and a deformity over the upper arm. *Id*.

*Halloran was treated for the left-shoulder injury at Allina Health Sports and Orthopaedic Specialists.* Halloran was referred for an MRI of his left shoulder to evaluate his rotator cuff tendon. AR at 153. The MRI revealed a "[f]ull thickness retracted rupture of the long head biceps tendon," "[m]ild tendinosis and mild partial thickness tearing of the distal supraspinatus tendon with mild infraspinatus tendinosis," a "[s]mall

---

[3]    "Proximal" means "[n]earest the trunk or the point of origin, said of part of a limb, of an artery, or a nerve, so situated." *Proximal*, *Stedman's Medical Dictionary* (28th ed. 2006).

[4]    "A winged scapula happens when your shoulder blade (scapula) noticeably sticks out instead of lying flat on your back." *Winged Scapula*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/winged-scapula (last visited July 2, 2025).

subcentimeter osteochondral injury/defect[5] involving the anterior humeral head[6] likely reflecting sequelae[7] of prior injury," and "[m]ild degenerative fraying of the superior labrum." AR at 447. The MRI did not reveal a "full-thickness rotator cuff tear," but showed "mild partial thickness degeneration" of the rotator cuff. AR at 447. Allina orthopedic surgeon Dr. Michael Freehill recommended "surgical intervention of an arthroscopic extensive debridement[8] with mini open biceps transplantation[9]" so that Halloran could return to his functional daily activities and necessary job functions. *Id*. Halloran's surgery with Dr. Freehill was scheduled for November 4, 2019. AR at 198.

---

[5]    "An osteochondral defect refers to a focal area of damage that involves both the cartilage and a piece of underlying bone." *Chondral/Osteochondral Defect*, Stanford Med., https://stanfordhealthcare.org/medical-conditions/bones-joints-and-muscles/chondral-osteochondral-defect.html (last visited July 2, 2025).

[6]    "Humeral head" is "the name applied to the heads of forearm muscles that attach to the humerus." *Humeral h.*, Stedman's Medical Dictionary (28th ed. 2006). This term may also refer to the "head" or the rounded upper part of the humerus. *See id. at Plate A18; see also Humerus*, *Dorland's Illustrated Medical Dictionary* (33d ed. 2020).

[7]    "Sequela" (and its plural, "sequelae") means "[a] condition following as a consequence of a disease." *Sequela*, Stedman's Medical Dictionary (28th ed. 2006).

[8]    "Debridement" means "[e]xcision of devitalized tissue and foreign matter from a wound." *Debridement*, Stedman's Medical Dictionary (28th ed. 2006).

[9]    Dr. Freehill later described the procedure he performed, perhaps more precisely, as "subpectoral biceps tenodesis surgery." *See* AR at 2046. "Tenodesis" means "[s]tablizing a joint by anchoring the tendons that move that joint, thereby preventing any further excursion of the tendons." *Tenodesis*, Stedman's Medical Dictionary (28th ed. 2006). The "mini-open" procedure "can often be performed through a smaller open incision than is used in traditional open repair." *Rotator Cuff Tears: Surgical Treatment Options*, Am. Acad. of Orthopaedic Surgeons, https://orthoinfo.aaos.org/en/treatment/rotator-cuff-tears-surgical-treatment-options (last visited July 2, 2025).

*Halloran could not perform his regular occupation after the left-shoulder injury.*
On October 29, 2019, Dr. Freehill completed a form entitled "Unum Disability and FMLA
Medical Certification" with an attached "Report of Workability," explaining that Halloran
was "UNABLE to work through 11/15/20[1]9," at which time his return to work would be
reassessed.    *See* AR at 198–99; *see also* AR at 200 (stating Halloran would be
"incapacitated for a single continuous period of time" between October 17, 2019, and
November 15, 2019, and listing probable duration of his medical condition as "anticipate
4–6[10] for full recover post operatively").

    *Halloran underwent left-shoulder surgery.*    On November 4, 2019, Dr. Freehill
performed "arthroscopic extensive glenohumeral[11] debridement and mini-open subpectoral
biceps resection/transplantation" surgery on Halloran's left shoulder.  AR at 148.

    *After the left-shoulder surgery, Dr. Freehill continued to restrict Halloran from
work.*  On November 15, 2019, Halloran had his first post-operative visit with Dr. Freehill.
*Id*.  Physician Assistant ("PA") Cindi Lynn Mansur completed a Report of Workability
after that visit, stating that Halloran was "UNABLE to work from [November 15, 2019]
through next office visit."  AR at 165.  On November 19, 2019, Dr. Freehill provided more
details to Unum in response to an information request, stating that Halloran's restrictions

---

[10]    Dr. Freehill did not indicate whether "4–6" was weeks or months.

[11]    "Glenohumeral" is defined as "[r]elating to the glenoid cavity and the humerus."
*Glenohumeral*, *Stedman's Medical Dictionary* (28th ed. 2006).    "Glenoid" means
"[r]esembling a socket; denoting the articular depression of the scapula entering into the
formation of the shoulder joint."  *Glenoid*, *Stedman's Medical Dictionary* (28th ed. 2006).

were: "no use of involved arm x 4 wks (in sling)," "off work as unable to lift and/or carry," and "no O/H use or O/S reaching activities at this time." AR at 163. In addition, Dr. Freehill wrote that he "anticipate[d]" Halloran would return to "full duty @ 4 mos post-op." *Id*. Dr. Freehill explained that Halloran "ha[d] no use of left shldr," and Halloran's "full recovery" was anticipated "4–6 mos post operatively." AR at 173–74. Dr. Freehill noted that Halloran would "be re-evaluated on 12-17-19." AR at 174. On December 27, 2019, Dr. Freehill reported to Unum that Halloran "did not have full ROM, strength + function of left shldr," and his estimated return-to-work date was "unknown @ this time." AR at 141–42.

*From December 2019 through March 2020, Halloran had seven physical therapy visits at Courage Kenny Sports & Physical Therapy.* During this period, Halloran saw Physical Therapist ("PT") Brenda Knaeble for treatment for his left shoulder. AR at 125 (Dec. 16, 2019), 122 (Dec. 26, 2019), 119 (Jan. 9, 2020), 102 (Feb. 7, 2020), 99 (Feb. 14, 2020), 96 (Feb. 21, 2020), 93 (Mar. 6, 2020). Halloran's self-reported left-shoulder pain intensity at these visits varied widely. AR at 125 ("severe pain" that was "achy into the shoulder"), 122 ("significant" and "severe" shoulder pain), 119 ("feeling pretty good," pain rated 6/10), 102 ("weak" but "[f]eeling better," pain rated 2/10), 99 ("[i]mproved" and "[f]eeling better," pain rated 2/10), 96 ("[s]evere"), 93 (pain rated 2/10). Throughout these visits, PT Knaeble consistently noted that Halloran's rehabilitation continued to progress. *See* AR at 93, 98–99, 102, 119, 122. PT Knaeble reported Halloran's work restrictions to Unum on two occasions. *See* AR at 114–15, 182–83 (advising that Halloran was "unable

to return to workload due to surgical healing" beyond February 28, 2020, "[u]nable to tolerate heavy or awkward lifting," and "[u]nable to safely perform repetitive work").

*Dr. Freehill examined Halloran on February 28, 2020.*    At his second post-operative visit with Dr. Freehill, Halloran reported he was "doing well," though he felt "behind schedule with his rehab." AR at 85. Halloran reported "mild pain" on the "anterior aspect of the shoulder" and "aching, dull, and occasionally sharp" pain increasing when he reached out, above shoulder level, behind his back, across his body, or when lifting, pulling, or pushing. *Id*. Halloran rated his pain level as 5/10. *Id*. Dr. Freehill's Report of Workability from that appointment stated that Halloran was "UNABLE to work from today through next clinic visit." AR at 89. On March 6, 2020, Dr. Freehill also reported to Unum that Halloran had "limited use of left arm—cannot perform normal duties of his current position of sheet metal fabricator," and Halloran's return to work was "unknown at this time," and would be "re-evaluated on [April 10, 2020]." AR at 110.

*COVID-19 shutdowns left Halloran to continue his left-shoulder rehabilitation from home.*    In a claim status update dated March 27, 2020, Unum recorded Halloran's frustration with COVID-19 closures preventing him from completing strengthening exercises at the gym. AR at 272. Unum also documented Halloran's "[d]eep nerve pain in [his] shoulder," and that he could not lift a laundry basket. *Id*.

*Halloran had a telemedicine visit with Dr. Freehill on April 3, 2020.*    AR at 406–10. Halloran described a "'deep/sharp nerve pain' in the area of his incision site that seems to flare after performing his home exercise program." AR at 406. Dr. Freehill's Report of

Workability from that appointment stated that Halloran was "UNABLE to work from today through NEXT FOLLOWUP APPOINTMENT." AR at 410.

*After an in-person examination on June 19, 2020, Dr. Freehill changed Halloran's restrictions and limitations to allow for "sedentary work."* Dr. Freehill reported that Halloran's "symptoms are showing no change since the last virtual visit on 4/3/2020," and "he has not been able to attend any physical therapy with [PT Knaeble] due to COVID." AR at 496. Halloran reported left-shoulder pain "on the anterior aspect but deep inside" that "progresses throughout the day." *Id.* Halloran stated his "shoulder is stiff" and that he was "compensating with his right arm." *Id.* Halloran also reported a "'disconnect' with his biceps" and a "'nerve pain' at times especially with mowing" that "radiates to his elbow" and is "worse with reaching out, reaching behind and over head." *Id.* Halloran rated his pain 7/10. *Id.* Dr Freehill ended his office visit note with Halloran's work restrictions, as follows:

> WEIGHT AND ACTIVITY RESTRICTIONS:
>
> Sedentary work: lifting, carrying, pushing, pulling up to 10 pounds occasionally.
>
> Mostly seated work with brief periods of standing and walking.

AR at 497, 500.

*Halloran questioned Dr. Freehill's sedentary work restrictions.* On July 8, 2020, Halloran called Dr. Freehill's office to "inquire[] why his work restrictions were changed from off work to read he can perform sedentary work, . . . as he d[id] not want to re-injur[e] his shoulder." AR at 492. After that call, PA Mansur noted:

> Discussed with [Halloran] that his insurance company has asked for specific capabilities—not statement stating off work. Noted that he meets criteria of Sedentary work although he is still unable to perform duties listed in his job description. Updated restriction of lifting, carrying, pushing, pulling up to 10 pounds occasionally.  Mostly seated work with brief periods of standing and walking were provided.  These will continue most likely until he is able to return to full duty after completion of PT with Erika Sandell Sabor.

*Id*.  On July 13, 2020, Dr. Freehill reported Halloran's sedentary work restrictions to Unum, explaining they were effective May 27, 2020.  AR at 432; *see also* AR at 452.

*From July 2020 to October 14, 2020, Halloran had six physical therapy visits at the Institute for Athletic Medicine to treat his left shoulder.*  During this period, Halloran saw PT Erika Sandell.  *See* AR at 521 (July 15, 2020), 528 (July 29, 2020), 602 (Aug. 13, 2020), 591 (Aug. 21, 2020), 579 (Sep. 2, 2020), 573 (Sep. 9, 2020).  At these visits, Halloran's reports of left-shoulder pain again varied widely.  AR at  521 (reporting "[a]nterior, lateral, scapular area, upper trap and upper arm" with pain radiating to his "[s]houlder and upper arm," "[l]oss of strength, numbness, painful arc and loss of motion/stiffness," and symptoms "exacerbated by lying on extremity and lifting and relieved by ice," pain rated 7/10)*,* 528 (reporting he felt "'really good' after his last appointment," pain rated 6/10), 602 (pain rated 1/10), 591 (reporting he "still feels pretty stiff in the am in the shoulders" and "lifting (pulling only) at the gym is helping but his bicep feels very 'crampy' at times," pain rated 1/10), 579 (pain rated 4/10), 573 (reporting shoulder "feels a lot better than when [he] first started," but that it "still feels weak—especially overhead," with "quite a bit of pain" after lawn-mowing, and describing pain as a "deep ache" "that will linger for the evening" but be gone the next morning if he takes Aleve, current pain level rated at 2/10).

11

PT Sandell's notes reflected Halloran's progress during this time. *See* AR at 522 (noting Halloran's AROM[12] Flexion[13] 125 Left and 130 Right; Abduction 130 Left and 135 Right; and External Rotation 20 Left and 55 Right), 602 (noting Halloran's "[r]esponse to therapy has shown an improvement in pain level, flexibility and strength"), 591 (reporting left-shoulder "AAROM full but AROM 150, 150 with pain in the pecs and lats"), 579 (noting Halloran "progressing with weights at the gym for his shoulder and feels like it's getting better" and describing symptoms as "resolving" and progress as "expected"), 573 (noting left-shoulder strength "4+/4/5/4 without pain," and left-shoulder range of motion "150/155/T8/55").

*Dr. Freehill notified Unum that Halloran could return to work with limitations in September 2020.* On September 11, 2020, Dr. Freehill again submitted Halloran's sedentary work restrictions to Unum. AR at 565 ("Sedentary work: lifting carrying, pushing, pulling up to 10 pounds occasionally. Mostly seated work with brief periods of standing and walking."). Dr. Freehill explained that Halloran could "Return to work WITH LIMITATIONS today through next clinic visit." *Id.*

*Halloran had two additional physical therapy visits with PT Sandell.* AR at 1177 (Oct. 7, 2020), 807 (Oct. 14, 2020). Halloran told PT Sandell he was progressing. *See* AR

---

[12]    "AROM" is an abbreviation for "active range of motion." *AROM*, *Stedman's Medical Dictionary* (28th ed. 2006).

[13]    "Flexion" means "[t]he act of flexing or bending" or "[t]he condition of being flexed or bent." *Flexion*, *Stedman's Medical Dictionary* (28th ed. 2006).

at 1177 (reporting "[t]he shoulder feels like it's getting stronger—still has some stiffness at the end range," pain rated 2/10).

*Halloran re-injured his left shoulder on October 20, 2020.* At Halloran's October 21, 2020 physical therapy visit, PT Sandell reported Halloran "was doing quite well and progressing with weights and high level proprioception[14] and working with overhead endurance" until he fell down the stairs the night before and reached out to catch himself with his left arm. AR at 803. Halloran "didn't hear or feel any pop/snap . . . but did have sharp pain in the anterior shoulder and deep in the shoulder." *Id*. Halloran's left elbow felt "very stiff" and "he [found] himself cradling his arm as if in a sling." *Id*. Sandell noted that Halloran's "elbow flexion/extension" was "limited and guarded—tender to palpation of ECRB,[15] triceps insertion and distal biceps," but there was "[n]o evidence of crepitus[16]

---

[14] "Proprioception" is "[a] sense or perception, usually at a subconscious level, of the movements and position of the body and especially its limbs, independent of vision; this sense is gained primarily from input from sensory nerve terminals in muscles and tendons (muscle spindles) and the fibrous capsule of joints combined with input from the vestibular apparatus." *Proprioception*, *Stedman's Medical Dictionary* (28th ed. 2006).

[15] "ECRB" is the "extensor carpi radialis brevis" muscle, a muscle "of posterior [extensor] compartment of [the] forearm." *Extensor carpi radialis brevis (m.)*, *Stedman's Medical Dictionary* (28th ed. 2006); *see also Extensor carpi radialis brevis*, *Mosby's Dictionary of Medicine, Nursing & Health Professions* (8th ed. 2009) ("[O]ne of the muscles of the posterior forearm. It inserts into the dorsal surface of the third metacarpal bone and functions to extend the hand and forearm.").

[16] Here, "crepitus" appears to refer to "the crackling sound produced by the rubbing together of fragments of fractured bone," or perhaps "the grating sensation caused by the rubbing together of the synovial surfaces of joints." *See Bony Crepitus* & *Joint Crepitus*, *Dorland's Illustrated Medical Dictionary* (33d ed. 2020).

or fracture." *Id*.  In addition, Sandell stated that "LHOB[17] very tender as was L upper trap, levator[18] and rhomboids[19] as they are guarding for pain." *Id*.  Halloran rated his "pain at rest" as "5/10 vs a 7/10." *Id*.

*Dr. Freehill examined Halloran on October 23, 2020, and maintained "sedentary" work restrictions*.  Dr. Freehill noted Halloran's "recent injury" that "resulted in a strain of [Halloran's] shoulder and elbow," but noted that his examination revealed no "significant structural damage."  AR at 673–74.  Dr. Freehill wrote that Halloran appeared to "strain[] his common extensor in the left elbow and shoulder," but his "rotator cuff and biceps appears intact and is strong."  AR at 674.  That same day, Dr. Freehill again reported Halloran's sedentary work restrictions to Unum.  AR at 670; *see also* AR at 674.

 *Between October 29, 2020, and December 10, 2020, Halloran had four additional physical therapy visits with PT Sandell.  See* AR 799 (Oct. 29, 2020), 795 (Nov. 5, 2020), 788 (Nov. 19, 2020), 785 (Dec. 10, 2020).  During this period, Halloran reported experiencing less pain.  *See* AR at 799 (pain rated 1/10), 795 (reporting shoulder was "still a little tight and clicks a lot—the clicking is painful about 30% of the time," pain rated

---

[17]    "LHOB" appears to refer to the long head of the biceps tendon, which "attaches to the top of the glenoid (shoulder socket)." *See Biceps Tendinitis*, Am. Acad. of Orthopaedic Surgeons, https://orthoinfo.aaos.org/en/diseases--conditions/biceps-tendinitis (last visited July 2, 2025).

[18]    "Levator" means "[o]ne of several muscles with an action to raise the part to which it inserts." *Levator*, *Stedman's Medical Dictionary* (28th ed. 2006).

[19]    Rhomboids are muscles of the upper back that draw the scapula toward the vertebral column.  *See Rhomboid Major (m.)* & *Rhomboid Minor (m.)*, *Stedman's Medical Dictionary* (28th ed. 2006); *Rhomboideus major* & *Rhomboideus minor*, *Mosby's Dictionary of Medicine, Nursing & Health Professions* (8th ed. 2009).

1/10); 788 (reporting that he "still feels the sharp pain on his L anterior shoulder in his 'dimple,'" pain rated 2/10), 785 (noting "'dimple' on [Halloran's] L shoulder has become painful in the past 2 weeks—where he notices a 'sharp, zinging' pain—especially when lowering from reaching overhead," pain rated 1/10).  PT Sandell also assessed Halloran's strength and range-of-motion progress in positive terms.  AR at 788 (noting Halloran's left-shoulder strength "4/4+/4+/4" and left-shoulder "AROM: 150/155/T9/65").

*Dr. Freehill modified Halloran's restrictions to allow him to lift more weight in December 2020.*  AR at 727–32.  After a telemedicine visit with Halloran on December 11, 2020, Dr. Freehill noted Halloran "continues to have pain at the anterior aspect of the shoulder," and he "notes a 'dimple' in the shoulder around this area and a 'click' that causes a 'deep nerve pain.'"  AR at 728.  Dr. Freehill and Halloran "[d]iscussed at length that he needs to continue to build strength and stamina in order to be able to return to work."  *Id*.  Dr. Freehill updated Halloran's work restrictions to allow for "[s]edentary work: lifting, carrying, pushing, pulling up to 15–20 pounds occasionally," and "[m]ostly seated work with brief periods of standing and walking."  *Id*.[20]

---

[20]    On December 17, 2020, in response to a Unum request for Halloran's restrictions and limitations, Allina Sports and Orthopaedic Specialists stated "no kneeling, squatting, or heavy lifting" from "10/19/2020 . . . through next followup."  AR at 717.  The form appears to have originated from Halloran's October 19, 2020 virtual visit with Allina Sports and Orthopaedic Specialists PA Bradley Joseph Shipley, during which PA Shipley shared the results of Halloran's knee MRI.  *See* AR at 680 (stating that "[a]ctivities that should avoiding [sic] including kneeling (direct pressure), squatting that causes symptoms and/or heavy lifting").    These restrictions reflect Halloran's duties at his regular occupation, which required standing for 90% of the shift; frequently bending, twisting, squatting, and lifting with arms extended; lifting up to 45 pounds; and possessing good manual dexterity.  AR at 77.  Nonetheless, it seems that any specific restrictions due to

*In January and February 2021, Halloran had two additional physical therapy visits with PT Sandell.* *See* AR at 1198 (Jan. 22, 2021), 900 (Feb. 12, 2021). Halloran reported his pain as regressing, yet he ranked his level of pain at zero out of ten. *See* AR at 1199 (reporting "'going backward' with his shoulder" and a "deep nerve pain" when pushing himself with exercises more, pain rated 0/10), 900 (reporting that he "feels sharp pain at his 'divot' in his L arm (incision site) that won't go away and will typically have to end his workout," pain rated 0/10). PT Sandell assessed "pain [with] forward flexion with palms facing ground," but he was "fine if he leads [with his] thumbs." AR at 971.

*Dr. Freehill examined Halloran on February 19, 2021.* Halloran's symptoms "show[ed] no change since the last clinic visit on 12/11/2020," and he still had pain "located anterior and medial," as well as "a lot of pain at the biceps incision," described as "sharp and intermittent" and "worse with working out, sleeping on affected side, reaching up, [and] reaching behind." AR at 878. Halloran rated his pain as 7/10. *Id.* Noting "some mild rotator cuff weakness today on exam," Dr. Freehill reported his plan "to transition [Halloran] back to work at our next visit," and that "should [Halloran] not be able to return to his job, he may have to think about switching careers." AR at 879. Dr Freehill recorded the following work restrictions at this visit:

WEIGHT RESTRICTIONS:

Sedentary work: lifting, carrying, pushing, pulling up to 15–20 pounds occasionally.

---

Halloran's knee problems eventually resolved. By April 12, 2022, when Unum was reviewing Halloran's claim under the "any gainful occupation" standard, Halloran told Unum that his "knee [was] better with strengthening" and it "[w]ould not keep him from working." AR at 1386.

ACTIVITY RESTRICTIONS:

Mostly seated work with brief periods of standing and walking.

RETURN TO WORK[:]

Return to work WITH LIMITATIONS today through next clinic visit[.]

*Id*.

After two additional physical therapy visits in March and April 2021, PT Sandell noted that Halloran was "ready to be discharged from therapy." *See* AR at 1047–48 (Mar. 4, 2021), 1041–42 (Apr. 15, 2021). Halloran's subjective reports at these visits reflected improvement. *See* AR at 1047 (reporting that though he "does have some limitations with overhead pressing still," Halloran's "body feels better" and "the consistency of getting back to the gym has been helpful"), 1041 (reporting that Halloran "doesn't get as much acute pain in his shoulder and he is getting better about not 'getting into his head' about it as much," though he "does still feel 'deep' pain in his dimple and in his axilla—especially when trying to do overhead pushing"). PT Sandell reported Halloran's range-of-motion progress. AR at 1047 (assessing "mild painful arc with L [shoulder] but after thoracic extension and with focusing on scap depression his pain was reduced"), 1041 (noting "slight reduction in his AROM at end range ER/ABD and flexion," "L shoulder AROM: 150/155/T7/70," "L shoulder passive extension=65," and "L shoulder strength: 4+/5-/5/5-"). PT Sandell's progress note from Halloran's April 15, 2021 visit concluded, "PT intervention is no longer required" for Halloran to meet his short- and long-term goals, and he was "ready to be discharged from therapy." AR at 1042.

*Dr. Freehill examined Halloran on June 1, 2021, after he again fell and re-injured his left shoulder.* AR at 998–1003. Dr. Freehill reported, "[Halloran] . . . experienced an acute injury to the left shoulder" two days before, "when he mis-stepped and caught his arm on the handrail forcing his arm into extension." AR at 999. Halloran rated his pain as 8/10, and he had "placed himself in a sling" because of the injury. *Id.* Though Halloran "denie[d] any subluxation/dislocation at the time of the incident," he was experiencing "increased anterior and posterior shoulder pain and limited range of motion affecting most activities of daily living." *Id.*; *see also* AR at 1000. Halloran reported "pain in his left elbow that he associate[d] with the hyperextension mechanism." AR at 999. Halloran could "activate the biceps, triceps, deltoid, and rotator cuff with gentle resistance bilaterally." *Id.* Dr. Freehill's examination revealed "limited range of motion, tenderness with palpation, and positive proactive testing." AR at 1000. X-rays showed "no evidence of fracture," though there was a "small opacified body anteriorly unchanged from October 2019 [pre-op] images." AR at 999. Dr. Freehill remarked that "there may be a soft tissue injury contributing to [Halloran's] symptoms" and ordered an MRI. AR at 1000. Despite this new injury, Dr. Freehill reported that Halloran could "[r]eturn to work WITH LIMITATIONS today through next scheduled appointment," under the sedentary work restrictions with "lifting, carrying, pushing, pulling up to 15–20 pounds occasionally" and "[m]ostly seated work with brief periods of standing and walking." AR at 1002.

*Dr. Freehill examined Halloran on June 25, 2021, and recommended a left-shoulder injection.* AR at 991–96. Dr. Freehill's left-shoulder exam indicated some tenderness signs of the left shoulder, but he rated Halloran's left-shoulder strength as

"ERO:5-/5, ER90:NT/5, SSP:5-/5, SSC:5-/5," "[a]ll with pain."  AR at 991.  Dr. Freehill

noted that Halloran's MRI after the June 2021 fall revealed "no structural damage other

than rotator cuff tendinosis which has not changed since his previous MRI," "no

inflammation in his biceps," and "biceps . . . intact."  AR at 992.  Halloran rated his pain

as 7/10.  AR at 991.  Dr. Freehill recommended an "ultrasound guided subcoracoid[21]

rotational internal [sic] injection to decrease pain and to determine if this is his pain

generator."  AR at 992.  Pursuant to Dr. Freehill's recommendation, PA Mansur performed

a left-shoulder ultrasound-guided sub-coracoid injection on July 16, 2021.  AR at 1260–

63.

*PA Austin Heneman at Twin Cities Pain Clinic examined Halloran on November 2,*

*2021.*  AR at 1133–36.  PA Heneman reported Halloran's history of "chronic" and

"constantly" occurring left-shoulder pain "aggravated by lifting, lying down, and

housework."  AR at 1133.  Halloran described his pain as "deep," "constant," and "sharp,

aching, and tender to touch," and rated his pain as 7/10.  *Id.*  PA Heneman reported Halloran

had "limited" and "active painful range of motion" in his left shoulder and ordered a

"biceps tendon injection" and physical therapy.  AR at 1133–5.

*Dr. Freehill and Halloran updated Unum in November 2021.*  On November 18,

2021, Dr. Freehill notified Unum that he would see Halloran on an "as-needed" basis if his

pain or symptoms returned.  AR at 1077–78.  On November 24, 2021, Halloran provided

---

[21]    "Subcoracoid" means "[b]eneath the coracoid process."   "Coracoid" means
"[s]haped like a crow's beak; denoting a process of the scapula."  *Subcoracoid* and
*Coracoid*, *Stedman's Medical Dictionary* (28th ed. 2006).

Unum an update.  AR at 1100–02.  Describing his "current day-to-day activities," Halloran reported:

> Morning walks with light stretches.  Household chores/projects that don't bother shoulder and bicep.  Go to gym as much as shoulder/bicep allows.  Frequency continues to change as my shoulder/bicep pain has increased.  Assist my wife with her daily cares as she is a wheelchair user and needs my assistance. Read and meditate before bed.

AR at 1100.  Halloran also wrote that his current condition did not prevent him from caring for himself.  *Id.*

*Meanwhile, Halloran was treated for knee pain that was not disabling.*   On August 5, 2020, Halloran saw PT Sandell, noting that he first felt anterior and sub-patellar pain in his right knee in July 2020, when he returned to the gym "after not doing much activity due to covid."  AR at 531.  Halloran's knee was "[c]atching," and he experienced some loss of motion and stiffness.  *Id.*  Halloran reported his knee pain as 2/10 (at its best) and 7–8/10 (at its worst).  *Id.*  During the next several months, Halloran proceeded to have office visits and physical therapy related to his right knee.  *See id.* (Aug. 5, 2020); AR at 602 (Aug. 13, 2020); AR at 591 (Aug. 21, 2020); AR at 579 (Sept. 2, 2020); AR at 573 (Sept. 9, 2020); AR at 684–692 (on Oct. 12, 2020, diagnosing "[p]atellofemoral pain syndrome of right knee"); AR at 807–13 (Oct. 14, 2020); AR at 678–83 (Oct. 19, 2020); AR at 803 (on Oct. 21, 2020, noting "knee MRI came back essentially saying his knee is 'perfect' per pt report"); AR at 799–802 (Oct. 29, 2020); AR at 785 (Dec. 10, 2020); AR at 1087–92 (Apr. 5, 2021).  There is no indication that Halloran's right-knee problems were disabling.  *See* AR at 839 (Feb. 8, 2021 (Unum status call noting "[k]nee is doing better.

20

MRI was normal."); AR at 1041 (on Apr. 15, 2021, noting knee "isn't too painful and [Halloran] is back doing most things at the gym without having issues"); AR at 1328 (on Jan. 25, 2022, Unum activity note stating that "EE reports knee better with strengthening. Would not keep him from working.").

C

*Halloran applied for short-term disability benefits, and Unum paid the claim.* *See* AR at 348 (Apr. 16, 2020 activity form indicating that "STD payments ended last week"); *see also* ECF No. 24 at 4 (stating STD claim was "approved and paid for the maximum duration of 26 weeks").

*Halloran applied for long-term disability benefits, and Unum paid the claim.* Unum sent notification letters of the claim's approval to Halloran and Tennant. *See* AR at 361, 369–72, 375–77.

*Information continued to support Halloran's "regular occupation" claim.* There is no dispute that information Unum gathered continued to support Halloran's claim under the "regular occupation" standard. Dr. Freehill's sedentary work restrictions meant that Halloran could not complete the medium work required by his regular occupation. *See, e.g.*, AR at 969, 980, 985, 1334.

*The upcoming end of the 24-month "regular occupation" period in April 2022 triggered an "any gainful occupation" review.* On October 13, 2021, Unum sent a letter to Halloran, stating that "as of April 13, 2022, your claim will be evaluated under a different definition of disability." AR at 1028. The letter explained the Plan terms, including that

21

Halloran must be under regular care of physician, and how to prepare for the definition of disability change. *Id*.

*Unum documented Halloran's capacity for sedentary or light work.* On November 15, 2021, Unum documented "no clear medical disagreement" that Halloran "would have capacity at sedentary or light function at this time." AR at 1334. Specifically, Unum noted:

> The insured's ability to return to his prior medium functional demands on a full-time consistent and sustainable basis (w/ OI noting requiring lifting up to 50lbs. occasionally, along with constantly Reaching, Occasionally Reaching Upward above shoulder) is not anticipated given the extensive LUE surgery performed w/ ongoing lack of full ROM of left UE, ongoing mild decreased strength, along with ongoing PT for work hardening now ~16 months since surgery. However, would have capacity at sedentary or light function at this time with no clear medical disagreement.

*Id*.

*Unum completed a vocational summary in January* 2022. Unum Senior Vocational Rehabilitation Consultant Catherine Rogers assessed whether Halloran had skills for other gainful occupations, considering his restrictions, limitations, and physical capacity. AR at 1336–38. Ms. Rogers considered Dr. Freehill's and PA Mansur's work restrictions allowing for sedentary work as of June 1, 2021. AR at 1336. Ms. Rogers' documented:

> Per 1/25/2022 Forum: The available information on file does not rise to a level to prelude [sic] FT sedentary or light capacity with no overhead work. There is no medical disagreement with FT sedentary at this time.
>
> Based on work history and education reported in the ILPTC, alternative gainful occupations at the sedentary or light level that meets [sic] the estimated gainful amount of $16.85, would

likely exist in the insured's labor market.  Viable labor market
(Minneapolis, MN).

*Id*.  Ms. Rogers based her vocational assessment on the following definition of "sedentary work": "[m]ostly sitting, may involve standing or walking for brief periods of time, occasionally throughout the day. Lifting, Carrying, Pushing, Pulling 10 pounds occasionally with changes in position for brief periods of time." AR at 1337.  Considering Halloran's limitations, skills, training, education, and work history, Ms. Rogers identified three sedentary occupations for which Halloran was qualified:  production clerk, rental dispatcher, and routing clerk.  AR at 1338.  Notably, the vocational summary incorporated a mistake—it considered the relevant labor market as Otsego, Michigan, rather than where Halloran lived: Otsego, Minnesota.  *Id*.; AR at 2123.  As described below, this mistake would be corrected during consideration of Halloran's appeal.  *See* AR at 2123.

*Unum notified Halloran that he would need to continue meeting policy requirements to remain benefit-eligible.*  On February 7, 2022, the Fields Disability law firm notified Unum that it would be representing Halloran in his long-term-disability claim.  AR at 1350. That same day, Unum sent a letter to Fields, stating that Halloran "must continue to meet the policy definition of disability and satisfy all other policy provisions to remain eligible for benefits." AR at 1353–54.

*Halloran sought a second opinion at Mayo Clinic in March 2022.*  On February 7, 2022, Halloran informed Unum that he was "in the process of getting a 2nd opinion" at Mayo Clinic for his condition.  AR at 1342.  On March 15, 2022, Dr. Suzanne Tanner in the Orthopedic Surgery / Musculoskeletal Clinic at Mayo Clinic evaluated Halloran's

left-shoulder pain.  AR at 1378–82.  In a clinical note following that visit, Dr. Tanner described Halloran's 2006 motor vehicle accident and the injury to his right shoulder, clavicle, and scapula, concluding that Halloran "does not have shoulder pain" with respect to that injury "except after the scapula related to the winging and at times petechiae[22] can occur at a scapular border," and that he "has persistent right shoulder stiffness."  AR at 1378.  As to Halloran's left shoulder, Dr. Tanner noted Halloran's "persistent diffuse pain in his left shoulder," and MRI results revealing left "rotator cuff tendinosis."  *Id*.  Dr. Tanner noted that "Dr. Freehill has not found conditions for which another operation would be beneficial." *Id*.  As to Halloran's left-shoulder pain and stiffness, Dr. Tanner noted:

> Per outside notes he has not responded to a "subcoracoid" injection suggesting that subcoracoid impingement is not an etiology.  There is mild glenohumeral osteoarthritis on radiographs based on presence of osteophytes.  There is rotator cuff tendinopathy, but no tears, per recent MRI.  There is slight fluid between the superior labrum and the glenoid but this may reflect previous debridement and it is uncertain that is a pain generator.  Per the MRI, if there is adhesive capsulitis, it is mild.
>
> . . . L sided mild neck pain, intermittent numbness left upper extremity and pain radiating to the ulnar 2 digits raises concern of cervical radiculopathy[.]

---

[22]    "Petechiae" are "[m]inute hemorrhagic spots, of pinpoint to pinhead size, in the skin, which are not blanched by pressure."  *Petechiae*, *Stedman's Medical Dictionary* (28th ed. 2006).

AR at 1381. Dr. Tanner ordered an electromyography[23] ("EMG"), "including checking long thoracic nerve and suprascapular nerves" to determine "if referral to a neurologist or spine clinic is indicated for evaluation of radiculopathy." *Id*. Dr. Tanner also stated that "[i]n an attempt to decrease pain [Halloran] would like to undergo ultrasound-guided corticosteroid injections of the left-shoulder joint. This may be beneficial if the pain is due to osteoarthritis or mild adhesive capsulitis." *Id*. Dr. Tanner recommended consultation with Dr. Joaquin Sanchez-Sotelo "to determine if treatment of right scapular winging is indicated," although Dr. Tanner "expect[ed] that will not be recommended since it is not a severe disorder." *Id*. Dr. Tanner stated that she did "not find operative conditions that are likely to benefit from operative treatment on the left. Options include further left debridement and/or a capsulotomy,[24] but opinion can be obtained by Dr. Sanchez-Sotelo." *Id*.

*Halloran underwent an EMG for his right shoulder at Mayo Clinic on March 23, 2022*. Dr. Holly Duck performed Halloran's EMG, which was ordered for "winging R scapula." AR at 1375–76. The final EMG report read as follows:

> Nerve conduction studies in the left upper limb were normal. The right suprascapular compound muscle action potential amplitude was 38% lower compared to the left. Needle electromyography in the right upper limb and shoulder girdle demonstrated long duration, high amplitude motor unit potentials firing with reduced recruitment in suprascapular and

---

[23] "Electromyography" is "[t]he recording of electrical activity generated in muscle for diagnostic purposes." *Electromyography*, *Stedman's Medical Dictionary* (28th ed. 2006).

[24] "Capsulotomy" is "[d]ivision of a capsule, as . . . through scar tissue that might form around a foreign body" or "[c]reation of an opening through a capsule, frequently done to gain entry into a joint." *Capsulotomy*, *Stedman's Medical Dictionary* (28th ed. 2006).

long thoracic nerve innervated muscles. Fibrillation potentials were not observed. Needle electromyography in the upper limb was normal.

**CLINICAL INTERPRETATION:**
Abnormal study. There is electrodiagnostic evidence of old right suprascapular and long thoracic neuropathies. There is no electrodiagnostic evidence of a left cervical radiculopathy or left upper limb mononeuropathy.

AR at 1375.

*Mayo Clinic did not provide work restrictions.* On March 24, 2022, Halloran contacted Mayo Clinic "to discuss restrictions with Dr. Tanner or her nurse." AR at 2016. The Mayo Clinic clerk taking Halloran's call noted, "[h]e's been playing a disability game." *Id.* Registered Nurse ("RN") Carol Eggum returned Halloran's call that same day, explaining that Mayo is "a consultative service and do[es] not guide work restrictions," and Halloran would "need to address this with his primary care physician." *Id.*

*Unum determined that there was "no medical disagreement" that Halloran had full-time sedentary work capacity.* In a letter dated April 6, 2022, Unum requested additional information from Halloran, reminding him that "as of April 13, 2022, [the] claim will be evaluated under a different definition of disability." AR at 1365–68. On April 11, 2022, Halloran's counsel notified Unum that the Mayo Clinic physician would not be providing restrictions for Halloran, and that Halloran had been referred back to Dr. Freehill to consider surgery later that year. AR at 1370. Unum recorded that Halloran would not see Dr. Freehill again until May 2, 2022—after the April 13, 2022 change-in-definition date. *Id.* On April 12, 2022, Unum documented its "forum" discussion of Halloran's claim.

AR at 1386–88.[25]  The Unum forum considered the updated information from Mayo Clinic in light of Dr. Freehill's continuing "sedentary work" restrictions, concluding that "[t]he available information on file does not pre[c]lude FT sedentary or light with no overhead work.  There is no medical disagreement with FT sedentary capacity at this time."  AR at 1386.  In an activity note dated April 14, 2022, Unum RN and Clinical Consultant Brandi Gowan reviewed Halloran's medical history in detail, concluding that "[b]ased on the above available information on file, [Halloran's] conditions do not rise to a level to preclude FT sedentary capacity at CID.  There continues to be no medical disagreement with FT sedentary capacity at this time." AR at 1395.  On April 18, 2022, Unum Benefits Specialist Tabitha Bickford noted her agreement with the recommended decision to cease benefits and close Halloran's claim because he was not precluded from performing the duties of other gainful occupations at the sedentary level.  AR at 1396–97.  On April 19, 2022, Unum notified Halloran's counsel of its conclusion that Halloran had full-time sedentary capacity.  AR at 1399.

*Unum terminated Halloran's benefits*.  In a letter dated April 19, 2022, Unum notified Halloran that it would be terminating his benefits.  AR at 1401–07.  In its letter to Halloran's counsel, Unum cited as supporting information for its decision Dr. Freehill's continuing "sedentary work" restrictions, Unum's review of Halloran's medical records (including from Mayo Clinic), and the evaluation of Halloran's employment history,

---

[25]    A "forum" discussion is understood to be a discussion regarding Halloran's claim among Unum personnel who were responsible for the claim's administration.

educational background, and occupational options within his capacity that could be performed within Dr. Freehill's restrictions.  AR at 1402–03.  Unum summarized:

> We have determined your client is not precluded from performing the duties of alternative, gainful occupations due to any conditions.  Because your client is no longer disabled according to the policy as of April 13, 2022, benefits are no longer payable as of that date.  Your client's Long Term Disability claim has been paid through April 12, 2022, and his claim has been closed effective April 13, 2022.

AR at 1403.  That same day, Unum notified Tennant Company that Halloran's benefits would be terminated.  AR at 1409–10.

*Dr. Freehill examined Halloran on May 2, 2022.*  AR at 1452–54.  After assessing Halloran's post-surgical left-shoulder status, his "[h]istory of clavicle fracture and overuse injury with long thoracic neuropathy," and "[r]ight shoulder girdle," Dr. Freehill reported:

> Patient indicates he is also having numbness and tingling in a radicular type fashion down the left upper extremity following his glenohumeral injection at Mayo Clinic.  He states he did not achieve any significant pain relief with this injection and progressive symptoms following.  At the current time he extensively reviewed his bilateral shoulder issues.
>
> With regards to the right shoulder while he does have some generalized dyskinesis and atypical winging pattern to [sic] does not appear to be a long thoracic neuropathy in isolation.  Furthermore the degree of winging does not appear to be significant enough to necessitate any type of surgical intervention in the form of tendon transfer.  I indicated this is a very complex procedure and would not likely improve his situation greatly particularly in light of the more recent acute exacerbation of his symptoms after years of having relatively normal function on that right side.
>
> Adequate regards to his left shoulder we reviewed again that he has had very little relief in terms of injection therapies despite multiple locations including subcortex subcoracoid

subacromial and glenohumeral.  None of these injections of [sic] allowed for any significant pain relief.  He now has some additional neurologic symptoms in a radicular component involving the left upper extremity.

These findings in light of the significant weakness bilaterally in the upper extremities I recommend he also undergo a neurologic consultation.  With his significant traumatic history, close[d] head injury, and his now progressive symptoms bilaterally I feel be [sic] worthwhile to address this from a neurologic standpoint.  He indicated he is also scheduled to see Dr. Sotelo[-]Sanchez at the Mayo Clinic with regards to his left shoulder and right shoulder.  I recommend he follow through that consultation to reassure him with regards to his diagnoses.

With his significant weakness bilaterally and marked limitations in his active and passive range of motion I recommended that he remain off work until his consultation with the Mayo Clinic.

AR at 1452.  Dr. Freehill also noted:

Incisions are well-healed on left shoulder.  He has previous healed incision the clavicle fracture on the right shoulder girdle[.]

His range of motion is generally markedly restricted with active range of motion limited to below 90 degrees of forward elevation bilaterally.  Passive range of motion is also limited secondary to moderate guarding bilaterally.  Is restricted to approximately 100 210 degrees of forward elevation and abduction.  External rotation has no significant limitations bilaterally.

He has diffuse tenderness of the rotator cuff bilaterally.  There is significant tenderness on the upper trap periscapular area on the right shoulder.

Of note he has significant weakness in all areas of manual muscle testing bilaterally with a shaking response to resistance.

Examination of the scapula reveals moderate winging of the superior medial border with mild winging inferior medially

> delayed activation of his upper trap and rhomboid areas on the
> right.

AR at 1453.

*Summit Orthopedics provided new work restrictions on May 9, 2022.* Following

Dr. Freehill's examination, Halloran's counsel sent the following message from Summit

Orthopedics to Unum:

> Andrew Halloran unable to work at all from 5/2/22 through
> Mayo Clinic evaluation on 6/13/22[.]  RESTRICTIONS ARE
> APPLICABLE 24 HOURS PER DAY:  Off work secondary to
> significant global upper extremity weakness.  The next
> scheduled MD appointment re-evaluation is 6/13/22[.]

AR at 1450–51.

*Unum determined that the May 9 Summit Orthopedics note did not warrant a*

*change in its decision that Halloran was capable of sedentary work.*  On May 12, 2022,

Unum Director Bonita Connally reviewed Dr. Freehill's May 2 clinical notes and the May

9 Summit Orthopedics note, concluding:

> The updated information submitted for review does not
> warrant a change in the prior opinion that [Halloran] is not
> precluded from FT sedentary as of CID 4/13/2022.  The
> submitted OV from Dr. Frehill [sic] (ortho) is following CID
> and the R/L's are dated 5/2/22 through 6/13/22 which are also
> following CID.  This AP provided prior R/L's that did not
> preclude FT sedentary capacity as per 4/14/22 CA-CID.  The
> information submitted does not contain any new medical
> information regarding medical conditions, no new
> imaging/diagnostics, and information related to these UE
> conditions was previously considered in prior CA-CID.

AR at 1458–59.  In a letter dated May 12, 2022, Unum notified Halloran that its review of

the additional information did not change Unum's decision that Halloran was not precluded

from full-time sedentary work as of April 13, 2022.  AR at 1464–68.  Specifically, Unum's

letter stated:

> The information submitted does not contain any new medical
> information regarding your client's medical condition(s).
> There were no new imaging/diagnostics included, and the
> information related to these upper extremity conditions was
> previously considered in our prior medical reviews, prior to the
> claim closure on April 13, 2022.

AR at 1466.

*Summit Orthopedics provided another work-restriction note, triggering Unum's*

*reconsideration of Halloran's claim.*  On May 19, 2022, Halloran's counsel sent Unum a

second note from Summit Orthopedics:

> Andrew Halloran unable to work at all from 4/12/22 through
> pain clinic consult on 7/15/22.    RESTRICTIONS  ARE
> APPLICABLE 24 HOURS PER DAY.
>
> Off work secondary to significant global upper extremity
> weakness.

AR at 1473–74.  These additional restrictions created a "medical disagreement," prompting

Unum to reconsider Halloran's claim.  *See* AR at 1478–81.

*Unum RN Gowan concluded that Halloran could perform sedentary work.*  On

May 24, 2022, RN Brandi Gowan filed a Unum activity note detailing her review of

Halloran's claim, including Dr. Freehill's May 2022 clinical notes and limitations.  AR at

1484–91.  RN Gowan concluded that Halloran's reported activities "do not preclude FT

sedentary at CID."  AR at 1490.  These daily activities include:

> Prior 8/2021 TPC with the EE noted he gets up and walks dogs,
> does home exercises, EE reported that he goes to the gym in
> the afternoons . . . , does stuff around the house that doesn't

involve overhead, can use the push mower, can't lift the bag of salt to put in the water softener, he is able to drive, reports he can lift 10–15 lbs. with the L shoulder.  Additionally, the EE's spouse is noted to be disabled (per EE report, is wheelchair dependent prior records indicated the EE was her caretaker).

11/24/21 DSU notes; daily activities include morning walks with light stretches, household chores, projects that don't bother shoulder/bicep, goes to gym as much as shoulder/bicep allows, frequency [sic] continues to change as . . . shoulder/bicep pain has increased, assists . . . wife with her daily cares as she is wheelchair user and needs . . . assistance, read and meditate before bed, no assistance w/ self-care, daily activities, or assistive devices needed.

*Id*.  RN Gowan also stated that "[t]he available imaging/diagnostics on file do not preclude FT sedentary at CID for any condition."  *Id*.  Based on her review of the updated information submitted, RN Gowan determined that nothing warranted a change in the prior medical opinion that Halloran was not precluded from full-time sedentary function on April 13, 2022.  AR at 1491.

*After requesting additional information from Dr. Freehill, Unum medical consultant Dr. Wendy Weinstein concluded that Halloran could perform sedentary work.* On June 6, 2022, Unum medical consultant Dr. Wendy Weinstein sent a letter to Dr. Freehill seeking additional information regarding Halloran's restrictions.  AR at 1497–1500.  Dr. Weinstein wrote:

From my preliminary review of the available records, it does not appear that the clinical information which shows the noted examination findings, intensity of care and reported functional activities is consistent with an impairment precluding Mr. Halloran from performing the listed occupational demands on a full-time basis as of 4/13/2022.

AR at 1498.  Dr. Weinstein restated Dr. Freehill's prior physical restrictions:

> Sedentary Work:  Mostly sitting, may involve standing or walking for brief periods of time.
>
> Occasional lifting, carrying, pushing, pulling up to 10 Lbs with changes in position for brief periods of time.
>
> The duties of the occupations are performed at desk level within body circumference.
>
> Overhead work is not required.

AR at 1498–99.  Dr. Weinstein asked, "Do you agree?" and left "yes," "no," and "no opinion" blanks that Dr. Freehill could check, with space to share his medical rationale if he believed Halloran was unable to meet these physical demands.  *Id*.  In his June 7, 2022 response to Dr. Weinstein's letter, Dr. Freehill did not check any of the requested boxes, but instead wrote:

> I was under the assumption he remained on same restrictions until evaluated by me 5/2/22.  Was unaware he did not receive updated restrictions through the Mayo treating physician. From my standpoint his restrictions remained as issued from 6/1/21 through 5/2/22 until re-evaluated with aforementioned issues as outlined in his clinic note dated 5/2/22.

AR at 1505.  On June 14, 2022, Dr. Weinstein documented her further review of Halloran's claim.  AR at 1522.  Dr. Weinstein considered Dr. Freehill's June 7, 2022 note and Halloran's previous restrictions, treatment, and conditions.  AR at 1522–24.  Dr. Weinstein stated that "the medical evidence does not support restrictions and limitations precluding" Halloran's sedentary-work functional capacity.  AR at 1523.  Dr. Weinstein concluded that Halloran's "reported symptoms, physical examination findings, diagnostic testing, intensity of treatment and noted activities reflected in the file do not support an impairment

precluding the claimant from performing the outlined [sedentary] occupational demands

on a full-time basis as of 4/13/22."  AR at 1524.

*Unum Director Bonita Connally concluded that Halloran could perform sedentary*

*work.*  On June 17, 2022, Ms. Connally documented:

> Benefits paid through 4/12/2022 and claim closed 4/13/2022, not disabled CID.  At the time of closure, medical information from Dr. Freehill and PA Mansur noted work R/Ls to allow for sedentary work.   Occupations were identified at this level through VA.
>
> Since time of denial, additional medical information was received and reviewed through OSP to include outreach to Dr. Freehill.  In response to OSP, AP indicates EE remained under prior R/Ls to OV 5/2/2022.  This included the period dating 6/1/21–5/2/22 and were previously specifically outlined by AP to include the ability for sedentary work.
>
> Based on this response and communication, at CID date 4/13/2022, EE retained the ability for sedentary work and gainful occupations were previously identified within AP R/Ls.   As such, I am in agreement that no change of determination remains.

AR at 1526.

*Halloran asked Unum to delay its reconsideration decision until Dr. Freehill*

*submitted more information.*  On June 17, 2022, Unum notified Halloran's attorney that

the additional information from Dr. Freehill did not change Unum's prior decision to

terminate benefits.  AR at 1528.  Halloran's attorney asked Unum to delay its decision

because Dr. Freehill "want[ed] to connect with Dr. Weinstein and provide additional

information."  *Id.*  Unum agreed to "hold up on decision."  AR at 1529.

*Dr. Freehill did not submit additional information.*  As of June 22, 2022, Unum had not received any additional information from Dr. Freehill.  AR at 1533.  During a phone call with Unum that day, Halloran's counsel stated that Dr. Freehill had made several attempts to contact Dr. Weinstein, who was scheduled to be out of the office until July 5, 2022.  *Id*.  In a letter dated June 23, 2022, Unum notified Halloran that Unum would delay its reconsideration decision until Dr. Weinstein returned.  AR at 1536.  On July 5, 2022, Unum documented that Halloran's attorney had left a message for Dr. Weinstein during the week of June 20 while Dr. Weinstein was out, indicating that "there is info forthcoming from Dr. Freehill."  AR at 1538.  Further, Unum noted that Dr. Weinstein had reviewed messages from the time she was out, and "confirmed that there have been no additional [voice mails] left for her by Dr. Freehill."  *Id*.  Unum also confirmed that it had not received any additional information from Dr. Freehill since the June 7, 2022 response to Dr. Weinstein's letter.  *Id*.  On July 8, 2022, Unum left a message with Dr. Freehill's office stating that "if [he] has additional info . . . that he would like us to consider, they can fax that info to us and we will review it if/when it is received."  AR at 1556.

*Unum denies reconsideration.*  In a letter dated July 8, 2022, Unum informed Halloran that the additional information he submitted did not change its prior decision to terminate his benefits.  AR at 1550.

*Meanwhile, Halloran sought additional treatment at Mayo Clinic in June and July 2022.*  On June 13, 2022, Halloran had a comprehensive visit with Dr. Sanchez-Sotelo in the Department of Orthopedic Surgery at Mayo Clinic to assess "bilateral shoulder pain and weakness."  AR at 1989–2006.  Prior to that visit, Halloran subjectively ranked his

pain as 75/100 (with 0 being "No Pain" and 100 being "Worst Imaginable Pain").  AR at

1999 (6/9/2022 response to questionnaire).    Dr. Sanchez-Sotelo's clinical notes

documented:

> Examination of the right shoulder shows forward elevation to 130˚ actively and 170 passively, external rotation to 50˚, internal rotation to T12.  The patient has diffuse weakness with rotator cuff testing.  I would classify this as 4+ out of 5 the limited due to pain and discomfort.  He has significant medial scapular winging with forward flexion of the shoulder.  He has some atrophy of this supraspinatus and the infraspinatus.  His trapezius appears intact with shoulder shrug testing.  He has a healed incision over the anterior clavicle.  He has dyskinesis and medial winging with scapular testing and resisted forward flexion and push up test.

> Examination of the left shoulder shows a healed subpectoral incision and arthroscopic incisions.  He has reproducible clicking and catching in the front of the shoulder and pain with bicipital groove testing.  He has a positive O'Brien's test.  He has 5/5 testing with rotator cuff testing there was significant pain in the anterior shoulder with any other range of motion.  He has forward flexion to 140˚, external rotation to 50˚, internal rotation to L4.  He has intact axillary nerve function.

AR at 1992.  After reviewing Halloran's medical history and current shoulder-related

symptoms, Dr. Sanchez-Sotelo noted that Halloran "feels that he can cope with his

left-sided symptoms" but "his main source of concern is his right shoulder."  AR at 1993.

Dr. Sanchez-Sotelo diagnosed "[l]eft shoulder painful clicking status post left shoulder

biceps tenodesis[26] performed elsewhere, radiographic evidence of a calcific density," and

"[r]ight shoulder abnormal scapular motion in a patient with EMG confirmation of

dysfunction of the suprascapular nerve and long thoracic nerve."  *Id*.  On July 15, 2022,

---

[26]    *See supra* note 9.

Halloran had a telemedicine visit with Nurse Practitioner ("NP") Thomas Drummond of the Division of Pain Medicine at Mayo Clinic. AR at 1968–87. After reviewing Halloran's medical history, NP Drummond noted that it is "in [Halloran's] best interest to continuing [sic] following up with orthopedics regarding his left shoulder." AR at 1970. NP Drummond also noted that he and Halloran "spent some time discussing the interrelationship of chronic pain, depression, and anxiety and the importance of addressing them all individually to make a positive impact on one's overall pain experience." AR at 1971.

*Halloran received another left-shoulder injection in August 2022.* On August 5, 2022, Dr. Shelby Johnson in Mayo Clinic's Sports Medicine Department administered a "left shoulder diagnostic ultrasound with an injection" to Halloran. AR at 1955. Dr. Johnson noted:

> Prior to the procedure the patient's area of maximal tenderness was palpated and marked. This correlated to the patient's bicipital groove, which was largely empty with the exception of the fibrillar appearance of a very thin (<1mm) layer of residual tendinous biceps tissue. No hyperemia of dyskinetic motion was demonstrated within the bicipital groove.
>
> Distally, the subpectoralis biceps tenodesis was intact without hyperemia, dyskinetic motion, or focal anechoic area to suggest tear. At the insertion of the latissimus dorsi/teres major tendon there was a 13.4 mm (AP) x 2.8 mm (CC) intratendinous hyperechoic focus with faint posterior acoustic shadowing and associated sonopalpatory tenderness, consistent with calcific tendinitis. This calcification correlates with the opacity demonstrated on shoulder radiographs 3/15/2022 as well as shoulder radiographs from prior to his surgery 10/17/2019. No hyperemia or dyskinetic motion was noted in this region. The patient's popping sensation was unable to be reproduced or visualized on today's exam.

Impression

#1 Chronic left latissimus dorsi/teres major calcific tendinitis, seen on radiographs dating back to 10/17/2019 #2 Intact left subpectoralis biceps tenodesis with sonographic appearance of a thin layer of residual tendinous long head biceps tissue #3 No sonographic reproduction of the patient's snapping sensation.

AR at 1955–56.

*Halloran was diagnosed with chronic pain syndrome in August 2022.* On August 31, 2022, Halloran had a telemedicine visit with Clinical Nurse Specialist Provider Virginia Nash in the Department of Psychiatry and Psychology at Mayo Clinic. AR at 1935–53. Nurse Specialist Nash diagnosed Halloran with generalized anxiety disorder, depressive disorder, and chronic pain syndrome. AR at 1935.

*Halloran underwent an EMG of his right shoulder in September 2022.* On September 15, 2022, Dr. Ayoosh Pareek in the Department of Neurology at Mayo Clinic ordered an EMG of Halloran's right shoulder.[27] AR at 1922–27. The EMG consultant, William J. Lichty, documented:

> The EMG study is abnormal. There continues to be electrophysiological evidence right suprascapular and long thoracic neuropathies. There is no electrophysiological evidence of ongoing denervation. Compared to the previous EMG study performed on March 23rd, 2022, there has been minimal improvement in the electrophysiological abnormalities.

AR at 1924.

---

[27] All relevant medical records indicate the "needle EMG" was performed on Halloran's right shoulder, even though the "reason for visit" is listed as "Primary Osteoarthritis Shoulder Left." AR at 1922–24.

*Halloran had an office visit with Dr. Sanchez-Sotelo in September 2022.* AR at

1901–21. On September 15, 2022, Dr. Sanchez-Sotelo documented:

> This patient returns today for a follow-up evaluation regarding his shoulders. His right side EMG confirmed the presence of an injury to both the long thoracic nerve and the suprascapular nerve. His exam remains unchanged. He is much more affected by his serratus anterior palsy[28] and I did not detect today much weakness in external rotation. As such, my recommendation would be to proceed first with a split transfer of the sternal head of the pectoralis major to the inferior pole of the scapula and only consider as a secondary procedure a [sic] arthroscopic decompression of suprascapular nerve if it became necessary.
>
> Unfortunately, he also continues to complain of discomfort in the prior tenodesis site performed by Dr. Free heal [sic]. He has some evidence of ectopic bone formation at the tenodesis site. He underwent an ultrasound here at Mayo Clinic that shows evidence that his biceps tendon is intact at the tenodesis site. I explained to the patient that some individuals will have ongoing pain at the tenodesis site. He is also concerned about overall weakness and clicking. We could possibly complete his evaluation with an MRI. The patient is interested. As such, we are going to pick up [sic] a date today for his upcoming tendon transfer and will also assess his left shoulder with an MRI and will discuss the results of the left-sided MRI when he comes for his right sided tendon transfer surgery.

AR at 1901.

---

[28]    The serratus anterior muscle originates from the center of the lateral aspect of the first eight to nine ribs and rotates the scapula and pulls it forward. *See Serratus anterior (m.)*, *Stedman's Medical Dictionary* (28th ed. 2006). "Palsy" means "[p]aralysis or paresis." *Palsy*, *Stedman's Medical Dictionary* (28th ed. 2006). "Paresis" means "[p]artial or incomplete paralysis." *Paresis*, *Stedman's Medical Dictionary* (28th ed. 2006).

*Halloran underwent a left-shoulder MRI in October 2022.*  On October 7, 2022, Halloran had an MRI of his left shoulder at Mayo Clinic.  AR at 1888–1900.  Dr. Naveen Murthy reviewed the MRI and documented the following impression:

> Motion artifact despite the patient's best efforts and repetition of sequences.  A skin marker was placed in the region of the patient's maximal discomfort which corresponds to the subpectoral biceps tenodesis.  The biceps tenodesis is intact without significant surrounding soft tissue or bone marrow edema.

> There is a small focus of low signal intensity heterotopic ossification in the region of the latissimus dorsi/teres major insertion with small enthesophyte formation and minimal surrounding bone marrow edema . . . .  This finding is more evident on the left shoulder radiographs of 3/15/2022 and was present on the 10/17/2019 radiographs which was prior to the tenodesis.

> Mild tendinopathy of the supraspinatus with a tiny intrasubstance tear.  Mild tendinopathy of the infraspinatus with small adjacent subcortical/subchondral cystic change and mild surrounding bone marrow edema.  No significant fatty muscle degeneration of the rotator cuff.

> Tiny focal fluid within the subacromial/subdeltoid bursa which can be seen with bursitis.

> The glenoid labrum is grossly intact.  No significant glenohumeral chondromalacia.

AR at 1892.

*Halloran had a follow-up telemedicine appointment at Mayo Clinic in October 2022.*  On October 25, 2022, Halloran had a telemedicine visit with Nurse Specialist Nash at Mayo Clinic to follow-up on his "anxiety, depression and chronic pain and medication management for the same."  AR at 1869–82.

40

*Halloran's left-shoulder MRI results were "normal."*  On October 26, 2022, PA Natalie Soukup from Mayo Clinic's Department of Orthopedic Surgery left a message in Halloran's patient portal with the results of his MRI.  AR at 1868.  Soukup wrote:

> Overall, your MRI did not look concerning.  Your previous bicep tenodesis remains intact without any concerning findings.  There is minimal to no surrounding swelling or inflammation in this area that would explain your symptoms.
>
> Unfortunately, this does not give us any further information as to why you have ongoing pain in this area.  However, fortunately it does provide reassurance that the mechanics in this area remain intact.  We will plan to proceed with your tendon transfer surgery on November 15th unless you tell us otherwise.

*Id*.  After speaking with Halloran later that day, PA Soukup documented:

> I would [sic] a long discussion with the patient over the phone today.  Continues to endorse significant left shoulder pain despite normal MRI findings.  He is interested in proceeding with a subacromial[29] and biceps tendon sheath injection to see if it can help with his pain.  He is very concerned about undergoing right shoulder surgery knowing that his left shoulder is significantly painful as well.  He is also interested in a trial physical therapy on the left side.  I have placed orders for subacromial and biceps tendon sheath injections as well as physical therapy.  We have postponed his upcoming right shoulder surgery until December 20th.

AR at 1866.  As far as the record shows, this surgery never occurred.

---

[29]    "Subacromial" means "[b]eneath the acromion process."  The acromion process or "acromion" is "[t]he lateral extension of the spine of the scapula that projects as a broad flattened process overhanging the glenoid fossa; it articulates with the clavicle and gives attachment to part of the deltoid muscles.  Its lateral border is a palpable landmark ('the point of the shoulder')."  *Subacromial* and *acromion*, *Stedman's Medical Dictionary* (28th ed. 2006).

*Dr. Freehill referred Halloran for a Functional Capacity Evaluation in April 2023.*
AR at 2046.   On April 13, 2023, Occupational Therapist ("OT") Kristin Hallenberg
performed a Functional Capacity Evaluation of Halloran.  AR at 2020–36.  OT Hallenberg
concluded that Halloran's "current physical capacities do not meet the job demands of full
time competitive work."  AR at 2034.

*Dr. Freehill examined Halloran on July 21, 2023.*  AR at 2037–39.  Dr. Freehill
noted:

> We had an extensive discussion regarding his ongoing issues
> with his bilateral shoulders.  This includes a chronic long
> thoracic neuropathy of which a split pectoralis major tendon
> transfer was recommended at the Mayo Clinic in addition to
> the ongoing discomfort he is having in the left axillary and
> biceps suprapectoral region.   He would like to pursue
> nonsurgical means [if] possible and I recommended
> consultation with Jonathan Reynolds physical therapist to see
> if there is any further opportunities for improvements.   A
> referral will be sent on his behalf.
>
> With regards to his right shoulder and the chronic neuropathy
> he indicates he is very reluctant to undergo a tendon transfer
> based on the extended recovery.   At vindicated [sic] he is
> having pain that is limiting his day-to-day activities and
> functionality and the chronicity of which she is [sic]
> experienced it would be reasonable to consider knowing the
> early recovery can be challenging.  He will consider his options
> and consult with the Mayo Clinic if he desires to pursue the
> tendon transfer process.
>
> I have indicated once again that the likelihood of him returning
> to a manual labor repetitive type job with his ongoing
> dysfunction bilaterally is highly unlikely.   A letter was
> provided on his behalf to his attorney with regards to his likely
> ongoing limitations and challenges.  This is based on his recent
> functional capacity evaluation that was also completed.  He
> will return to see us on an as-needed basis.

AR at 2038 (sic throughout).  In a letter dated July 25, 2023, Dr. Freehill wrote:

> I referred Andrew Halloran for a Functional Capacity Evaluation, which was conducted on April 13, 2023, to better determine his functional limitations.  The purpose of this letter is to supplement the FCE report by Kristin Hallenberg, OTR/L, Courage Kenny Sports & Physical Therapy.  I have no reason to doubt the restrictions determined by Ms. Hallenberg.  The evaluation is consistent with Mr. Halloran's bilateral shoulder conditions and findings on examination.  He likely would have difficulty performing any job that requires use of his upper extremities due to pain and functional limitations.

> I have reviewed Mr. Halloran's history, including Mayo Clinic records.  Mr. Halloran has a significant history with his upper extremities.  He had a major motor vehicle accident in 2006, with multiple injuries including a right clavicular fracture requiring surgery.  He had a work-related right shoulder injury in 2016 and was noted at that time to have winging of the right scapula.  He suffered another injury in October 2019 to his left shoulder causing a rupture of right biceps tendon.  In November 2019, he had extensive arthroscopic glenohumeral debridement and left subpectoral biceps tenodesis surgery.  He now has persistent anterior shoulder pain/clicking sensation.  An MRI in June 2021 showed a calcific density that correlates to his focal area of pain.  Mr. Halloran has tried numerous conservative treatments including rounds of physical therapy, massage, ice, heat.  PT was stopped because he was unable to progress.  He has continued to do HEP.  He was seen by Dr. Sanchez-Sotelo for evaluation of an opacity demonstrated on left shoulder radiograph 3/15/22 and anterior should [sic] pain/clicking sensation.  Mayo performed an ultrasound of his left shoulder on August 5, 2022.  The findings showed calcific tendinitis which correlated with the opacity shown on the 3/15/22 radiographs.  The impression was chronic left latissimus dorsi/teres major calcific tendinitis.  Calcific tendinitis of the shoulder is an acute or chronic painful condition due to the presence of calcific deposits inside or around the tendons of the rotator cuff.  An EMG of his right shoulder on March 22, 2022 was consistent with dysfunction of the suprascapular nerve and the long thoracic nerve.

I evaluated Mr. Halloran on May 2, 2022. On examination, his range of motion was generally markedly restricted with active range of motion limited to below 90 degrees of forward elevation bilaterally; passive range of motion was also limited secondary to moderate guarding bilaterally. He had diffuse tenderness of the rotator cuff bilaterally, with significant tenderness on the upper trap periscapular area on the right shoulder. He had significant weakness in all areas of manual muscle testing bilaterally with a shaking response to resistance. I informed Mr. Halloran that surgical intervention in the form of tendon transfer is a very complex procedure and would not likely improve his situation greatly.

Due to Mr. Halloran's increased symptoms, on May 2, 2022, our office issued a work restriction of no work through 6/13/22 secondary to significant global upper extremity weakness. The work restriction was modified on May 18, 2022, to extend to 7/15/22 through his pain consult on 7/15/22. Mr. Halloran's condition has remained relatively the same. In June 2022, Mayo Clinic discussed with Mr. Halloran the possibility of a split transfer of the right pectoralis major to the inferior pole of the scapula and explained the magnitude of the surgery. Mr. Halloran wanted to avoid surgery if possible. Another EMG was done in September 2022 showing minimal improvement in the electrophysiological abnormalities as compared to the March 2022 EMG study. Ultimately surgery was scheduled but later postponed due to significant pain in the left shoulder. Mr. Halloran has continued to perform HEP but has been searching for a specialized PT program.

His bilateral shoulder history is complex, and there is no easy fix. It is unlikely that surgery will eliminate his chronic pain given his history.

AR at 2046.

*Halloran began physical therapy treatment with a new provider in August 2023*.

On August 14, 2023, Halloran had a visit with PT Jonathan Reynolds at Orthology. AR at 2040. Halloran rated his pain between 6–8/10. *Id*. PT Reynolds noted that Halloran's

long-term goal was to "have full, painless ROM in the left shoulder within 4–6 visits." AR at 2045.

*Halloran appealed the denial of his benefits.* On September 14, 2023, Halloran appealed Unum's decision. AR at 1590–2046. To support his appeal, Halloran included excerpts of medical opinions regarding his medical issues and functional capacity from his treating physicians and therapists. *Id.* This included records documenting physical therapy visits with Sandell, records from Mayo Clinic visits, Hallenberg's Functional Capacity Evaluation, and Dr. Freehill's July 25, 2023 letter. *See* AR at 1592–2046.

*Unum's Senior Vocational Rehabilitation Consultant Kelly Marsiano reviewed Halloran's appeal and concluded he could perform sedentary work.* Ms. Marsiano submitted a review of Halloran's claim on September 22, 2023. AR at 2122–24. Ms. Marsiano noted the previous mistake with reporting the labor market of Otsego, Michigan (rather than that for Otsego, *Minnesota*), and she reported the hourly wages for the appropriate labor market. AR at 2123. Ms. Marsiano noted that the physical demands of the three positions—production clerk, rental dispatcher, and routing clerk—required "recording information on computers," but this was "not at a production pace that would require constant keyboard use." *Id.* In addition, Ms. Marsiano determined these positions would not require "more than occasional reaching."[30] *Id.* Ms. Marsiano concluded these

---

[30]    Though Halloran frequently complained of left-shoulder pain being exacerbated by reaching, *see* AR at 496, 785, 878, beginning in June 2020, neither Dr. Freehill nor any other treating medical professional restricted Halloran from reaching. *See* AR at 432, 497, 565, 670, 728, 879, 1002; *compare with* AR at 163 (Nov. 19, 2019 post-surgical restriction "no O/H use or O/S reaching activities at this time").

positions were "within the functional capacity provided by the insured's attending physician Dr. Freehill and PA Cindi Mansur." *Id*.

*Unum's RN and Senior Clinical Consultant Allison Purtell reviewed Halloran's appeal and concluded he could perform sedentary work.* AR at 2126–33. After reviewing Halloran's medical records in detail, RN Purtell determined that Halloran's "symptoms / conditions do not rise to a level that would preclude full time sedentary work." AR at 2132. RN Purtell stated that Halloran's "[e]xam findings are consistent with functional capacity to perform the identified occupational demands." *Id*. In addition, RN Purtell stated that Halloran's "activities are inconsistent with his claimed level of impairment," notably that he "is a primary caretaker of his disabled wife and provides assistance with transfers to and from her wheelchair." AR at 2133. RN Purtell thus concluded that the available medical and file information did not support any conditions resulting in restrictions or limitations that would preclude Halloran from performing the alternate occupational demands as outlined on April 13, 2022. *Id*.

*Unum's consulting physician Dr. Howard Grattan reviewed Halloran's appeal and concluded he could perform sedentary work.* AR at 2171–76. Dr. Grattan noted Dr. Freehill's restrictions from as early as June 2021, which stated that Halloran could "lift, carry, push, and pull 15–20 pounds occasionally, performing mostly seated work with brief periods of standing and walking." AR at 2172. Dr. Grattan assessed Dr. Freehill's post-claim-denial restrictions, Halloran's more recent medical records, and Hallenberg's Functional Capacities Evaluation. *See* AR at 2172–74. Dr. Grattan determined that the medical findings of "subpectoral biceps tenodesis and chronic left latissimus dorsi/teres

major calcific tendinitis . . . would not be considered impairing in the context of sedentary demands." AR at 2174. In addition Dr. Grattan noted: (1) Halloran's right shoulder issues "predate[ed] the date of disability," and Halloran "was able to work in his own occupation with this condition until . . . [his] left bicep strain," *id*.; (2) aside from the August 14, 2023 physical therapy, Halloran had not been to physical therapy since July 16, 2021, and the "intensity of [Halloran's] treatment was not consistent with the claimed severity/persistence of symptoms," AR at 2175; (3) Halloran's reported ankle and lower back pain with squatting was not a claimed impairment, and there was no "correlating pathology or other significant abnormalities on exams to support that his chronic pain is of the severity to impair his ability to function" at the level indicated on his Functional Capacity Examination, *id*.; (4) with respect to Halloran's knee pain, Halloran's medical records "do not include consistent notes with findings such as a substantial loss of stability or functionality . . . which would support restrictions from the sedentary occupational demands as described as of 4/13/22," *id*.; (5) noting Halloran's treatment for depression and anxiety, there was no evidence to support that it "contributes to a loss of functional capacity," *id*. Dr. Grattan concluded that "the medical and file information does not support restrictions and limitations precluding [Halloran] from performing the occupational demands defined as of 4/13/22." *Id*.

Halloran responded to Dr. Grattan's opinion in a letter dated November 2, 2023. AR at 2223–27. However, Halloran did not provide any additional clinical or vocational information for review. *See id*.

*Unum affirmed its decision to terminate Halloran's benefits.* In a letter dated November 7, 2023, Unum denied Halloran's appeal. AR at 2201–09. Unum stated that "the available medical and file information does not support any conditions that would have limited Mr. Halloran from performing sedentary level work as of April 13, 2022. Because he had received 24 months of payments and he was capable of performing alternate gainful employment, the decision to deny benefits on his claim was appropriate." AR at 2206. Unum notified Tennant Company of its decision. AR at 2211.

*Halloran filed this lawsuit.* Halloran filed this lawsuit on January 25, 2024. *See* Compl. [ECF No. 1]. The Complaint asserts a claim for benefits under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B). Compl. ¶¶ 115–19. For relief, Halloran seeks benefits due plus interest and reasonable attorneys' fees and costs. *Id*. at 20.

II

A

Suits brought under § 1132(a)(1)(B) to recover benefits allegedly due to a participant are reviewed de novo unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan grants the administrator such discretion, then "review of the administrator's decision is for an abuse of discretion." *Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 714 (8th Cir. 2019) (quoting *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 759 (8th Cir. 2012)). Here, the parties agree that Halloran's claim and Unum's termination decision should be reviewed de novo. *See* ECF No. 24 at 27; ECF No. 29 at 2.

48

Under the de novo standard, a district court must make an independent decision regarding benefits, affording no deference to the plan administrator's decision. *See Firestone Tire and Rubber Co.*, 489 U.S. at 112; *accord Kaminski v. UNUM Life Ins. Co. of Am.*, 517 F. Supp. 3d 825, 858 (D. Minn. 2021). A district court must determine "whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Kaminski*, 517 F. Supp. 3d at 858 (citation modified). The claimant bears the burden of showing he is disabled and entitled to benefits under the plan. *Farley v. Benefit Tr. Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992). And when, as here, parties request a ruling under Rule 52, a district court acts as a factfinder, resolving fact disputes, making credibility determinations, and weighing the evidence. *See Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1026 (8th Cir. 2021); *Chapman v. Unum Life Ins. Co. of Am.*, 555 F. Supp. 3d 713, 716 (D. Minn. 2021).

B

For several reasons, I conclude that Halloran has not met his burden to show by a preponderance of the evidence that he was disabled and entitled to benefits as of April 13, 2022.

Halloran's claim-prompting health problem was the October 16, 2019 injury to his left shoulder, resulting in Dr. Freehill's November 4, 2019 "[l]eft shoulder arthroscopic extensive GH debridement, mini-open subpectoral biceps transplantation" surgery. AR at 148. There is no dispute that Halloran experienced this injury, and neither Unum nor any treating medical professional questioned the diagnosis or subsequent surgery. Unum approved and paid both short- and long-term disability benefits on this claim based on

Halloran's inability to perform his "regular occupation" up until April 13, 2022. *See* AR at 348, 361, 369–72, 375–77; *see also* ECF No. 24 at 4 (stating STD claim was "approved and paid for the maximum duration of 26 weeks."); AR at 2202 ("While it was determined that Mr. Halloran may continue to experience symptoms that limit him from performing the demands of his prior occupation, as of April 13, 2022, the policy requires a review of his ability to perform alternate gainful employment.").

Though the administrative record contains substantial, undisputed evidence that Halloran was unable to perform the material and substantial duties of his *regular* occupation after the injury, that did not prevent him from working in a sedentary capacity even as early as June 19, 2020. AR at 495–99. Dr. Freehill repeated Halloran's sedentary work restrictions on July 7, July 13, September 11, and October 23, 2020. AR at 500, 432, 565, 670. On December 11, 2020, Dr. Freehill modified Halloran's restrictions and limitations to provide a less restrictive weight limit, allowing him to lift, carry, push, or pull "up to 15–20 pounds occasionally." AR at 728. Dr. Freehill again repeated these sedentary work restrictions on February 19 and June 1, 2021, and June 7, 2022. AR at 879, 1002, 1505. Dr. Freehill's restrictions remained in place even after Halloran suffered two separate falls and re-injured his left shoulder. *See* AR at 673–75 (October 2020 fall); AR at 998–1003 (June 2021 fall). Dr. Freehill's sedentary work restrictions were in place when Unum initially reviewed Halloran's claim under the "any gainful occupation standard," and based on Unum's vocational review, it identified three occupations Halloran could perform within Dr. Freehill's prescribed restrictions. AR at 1403; *see also* AR at 1652–61 (job descriptions). No medical provider opined that as of April 13, 2022, Halloran was unable

to work in a sedentary capacity. Unum's denial of Halloran's benefits under the "any gainful occupation" standard was in lockstep with Halloran's restrictions.

Dr. Freehill's attempts to walk back Halloran's restrictions after-the-fact do not change things. After Halloran's claim was denied, Halloran had an office visit with Dr. Freehill on May 2, 2022. Summit Orthopedics then sent two separate notes to Unum. The first note stated that Halloran was "unable to work at all from 5/2/22 through Mayo Clinic evaluation on 6/13/22" due to "significant global upper extremity weakness." AR at 1451. This restriction changed nothing, as it did not preclude sedentary capacity as of the April 13, 2022 change-in-definition date. Then Dr. Freehill sent another note stating that Halloran was "unable to work at all from 4/12/22 through pain clinic consult on 7/15/22." AR at 1474. The problem with that note is that nothing in Halloran's medical records (from Dr. Freehill or others) explained why such restrictions—which contradicted all of Dr. Freehill's prior, contemporaneous restrictions—would have been required as of April 13, 2022. When pressed by Dr. Weinstein, Dr. Freehill backtracked on his noted restriction, stating that he (Dr. Freehill) was "under the assumption [Halloran] remained on same restrictions until evaluated by me 5/2/22," he "[w]as unaware [Halloran] did not receive updated restrictions through the Mayo treating physician," and "[f]rom [Dr. Freehill's] standpoint, [Halloran's] restrictions remained as issued from 6/1/21 through 5/2/22 until re-evaluated with aforementioned issues as outlined in his clinic note dated 5/2/22." AR at 1505. The June 1, 2021 restrictions to which Dr. Freehill referred were for "sedentary work" and lifting up to 15–20 pounds occasionally. AR at 1002. Finally, Dr. Freehill's July 25, 2023 letter, stating that he has "no reason to doubt" the

functional limitations of OT Hallenberg's Functional Capacity Evaluation, AR at 2046, appears to reflect Dr. Freehill's July 21, 2023 clinical note that Halloran is "highly unlikely" to "return[] to a manual labor repetitive type job with his ongoing dysfunction," AR at 2038. But Halloran's claim was not being evaluated to return to his regular, manual labor occupation as of the April 13, 2022 change-in-definition date, as Unum acknowledged that Halloran could not return to that position with his limitations. *See* AR at 1334. Moreover, Dr. Freehill's July 25, 2023 letter piggy-backed on Hallenberg's Functional Capacity Evaluation, which tested Halloran's "present physical abilities and limitations" and functional capacity as of *April 13, 2023*, not at the critical April 13, 2022 change-in-definition date for which Unum was evaluating Halloran's ability to perform the material and substantial duties of "any gainful occupation." AR at 2020–31. In other words, both Hallenberg's functional-capacity conclusions and those of Dr. Freehill from July 2023 appear inconsistent with Halloran's previous medical records, and neither Dr. Freehill nor Hallenberg explain how their opinions reflect Halloran's condition as of the critical April 13, 2022 change-in-definition date. Likewise, PT Jonathan Reynolds' August 14, 2023 evaluation does not reflect Halloran's condition as of the relevant date. *See* AR at 2040–45. Based on a close and thorough review of the administrative record, I find more persuasive Dr. Grattan's opinion that based on "the minimal and stable diagnostic imaging findings, lack of significant upper extremity weakness, minimal treatment intensity, and [Halloran's] reported functional activities . . . , it is reasonable to conclude that [Halloran's] chronic pain is stable and that [he] would not be precluded from

performing the outlined occupational demands on a full-time basis" as of April 13, 2022. AR at 2175.

To the extent the administrative record reflects medical treatment for Halloran's knee or mental health conditions, Halloran did not claim that those health conditions contributed to an inability to perform "any gainful occupation" under the terms of the Plan. No occupational restrictions or limitations were in place for those two conditions as of the critical April 13, 2022 change-in-definition date.

Halloran's right-shoulder condition also did not prevent Halloran from performing sedentary work in April 2022. Halloran's right-shoulder injury occurred in 2006, when Halloran was involved in a serious accident. Halloran's right-side "scapular winging" was a product of that accident, and neither that condition nor his other attendant right-shoulder issues prevented Halloran from performing his medium-work, regular occupation for several years prior to his left-shoulder injury. *See* AR at 2174. Moreover, as Dr. Grattan aptly noted, the "electrodiagnostic evidence of right suprascapular and long-head thoracic neuropathies" was "not new" and predated the date of disability, and any findings related to the scapular winging were "unchanged since 06/01/21," when Dr. Freehill offered his "sedentary work" restrictions. AR at 2172, 2174. Halloran's right-shoulder condition did not prevent him from performing sedentary work.

Halloran's arguments that Unum failed to comply with its own claims manual or failed to give appropriate deference to Halloran's treating physicians pursuant to its Regulatory Settlement Agreement are not persuasive. I do not agree that the administrative record shows these things occurred or, assuming they did, caused Unum to render an

erroneous claims decision. *See Garwood v. Sun Life Assurance Co. of Can.*, No. 22-cv-1918 (MJD/DLM), 2024 WL 1285731, at *3 (citing *Avenoso*, 19 F.4th at 1024, 1026).

Unum's initial mistaken reference to a Michigan labor market in the vocational review does not change things. Halloran takes issue with Unum's initial reference to the Otsego, Michigan (not Minnesota) labor market. ECF No. 24 at 11 (citing AR at 1338); *see also* AR at 2068. This mistaken reference was corrected in Unum's decision on appeal, which noted an even higher hourly wage for the previously identified gainful occupations in the Otsego, Minnesota labor market. AR at 2123, 2203. Halloran argues that "Unum does not show its math in how it arrived at $16.85 for the indexed monthly earnings." ECF No. 32 at 2 n.1. This is not correct. *See* AR at 1285. Halloran also disputes Unum's factual assertion that under the Plan's terms, benefits stop and the claim ends "after 24 months of payment, when you are able to work in any gainful occupation on a *part-time basis* but you do not." ECF No. 29 at 4–5 (emphasis added). Unum argued that because the Plan defines "part-time basis" as "the ability to work and earn between 20% and 80% of your indexed earnings," Halloran was required to demonstrate that after 24 months, he was "completely unable to work, even on a part-time basis, with earnings of $973.39 per month." *Id.* at 5. Unum did not evaluate Halloran's claim under this standard until litigation, and it appears to have abandoned the argument, having not addressed it in its reply brief. *See* ECF No. 36. This argument was not considered in reaching this decision.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff Andrew Halloran's Motion for Judgment on the Administrative Record [ECF No. 22] is **DENIED**.

2.      Defendant Unum Life Insurance Company of America's Motion for Judgment on the Administrative Record [ECF No. 27] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 3, 2025                                s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court